**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| RICHARD A. FUNK and RACHAEL FUNK, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING, EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, and TRANS UNION, LLC <br><br> Defendants. | Case No. 1:22-cv-00301 |

## CLASS ACTION COMPLAINT

**NOW COME** RICHARD A. FUNK ("Richard") and RACHAEL FUNK ("Rachael") (collectively, "Plaintiffs"), individually, and behalf of all others similarly situated, by and through their undersigned counsel, complaining of NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING ("Shellpoint"), EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian"), EQUIFAX INFORMATION SERVICES, LLC ("Equifax"), and TRANS UNION, LLC ("Trans Union"), as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action seeking redress for violations of the Texas Debt Collection Act ("TDCA"), Tex. Fin. Code §392 *et seq*., breach of contract, violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq*., and unjust enrichment.

2.      Plaintiffs' claims arise from Shellpoint's unlawful assessment of charges to Plaintiffs' mortgage loan. Specifically, Shellpoint unilaterally purchased and charged Plaintiffs for

a property insurance policy despite having actual knowledge that Plaintiffs maintained their own property insurance policy. Despite Plaintiffs' repeated disputes of the erroneous insurance charges, Shellpoint refused to reverse the charges it unfairly assessed to Plaintiffs' mortgage loan. As a result of Shellpoint's conduct, Plaintiffs' mortgage loan fell into default status despite the fact that Plaintiffs were contractually current on their mortgage loan. Moreover, Shellpoint destroyed Plaintiffs' credit scores by falsely reporting their mortgage loan as past due when in fact it was current.

3.      Upon information and belief, Shellpoint's conduct in unilaterally purchasing a property insurance policy despite having actual knowledge that a borrower maintains his/her own policy is a widespread practice that has injured hundreds, if not thousands, of consumers in Texas.

4.      Specifically, the insurance policies unilaterally purchased by Shellpoint are significantly more expensive than the insurance policies that are independently maintained by consumers, including Plaintiffs.

5.      Upon information and belief, Shellpoint receives kickbacks from the insurer that issues the insurance policies that Shellpoint unilaterally purchases on behalf of consumers without a valid basis. Accordingly, Shellpoint profits from its scheme and the scheme results in significant monetary loss to Texas consumers as consumers are forced to pay for more expensive insurance policies to bring their mortgage loans current.

## JURISDICTION AND VENUE

6.      The Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 as the FCRA is a federal statute.

7.      The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

8.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because all of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district.

## PARTIES

9.     Plaintiffs are a natural persons, over 18-years-of-age, who own the real property located at 3302 Maywood Avenue, Unit B, Austin, Texas 78703 ("Property").

10.     Shellpoint is a prominent mortgage servicer that services mortgage loans nationwide, including mortgage loans issued to Texas consumers. Shellpoint does business in Texas and maintains nerve-center operations in Houston, Texas.

11.     Experian is a credit reporting agency that is in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports and credit files to third parties bearing on a consumer's creditworthiness, credit standing, and credit capacity. Experian maintains its principal place of business in Costa Mesa, California and maintains nerve-center operations in Dallas, Texas.

12.     Equifax is a credit reporting agency that is in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports and credit files to third parties bearing on a consumer's creditworthiness, credit standing, and credit capacity. Equifax maintains its principal place of business in Atlanta, Georgia. Equifax regularly conducts business in Texas.

13.     Trans Union is a credit reporting agency that is in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports and credit files to third parties bearing on a consumer's credit worthiness, credit standing, and credit capacity. Trans Union maintains its principal place of business in Chicago, Illinois. Trans Union regularly conducts business in Texas.

14.     Experian, Equifax, and Trans Union (collectively, "the CRA Defendants" or "CRAs") are the three most prominent credit reporting agencies in the United States. Accordingly, the credit and lending industry heavily rely on the information provided by the CRA Defendants in their lending decisions.

## FACTUAL ALLEGATIONS

15.     In July 2007, Plaintiffs obtained a first mortgage loan ("Loan") from First Horizon Home Loans ("First Horizon"), secured by the Property.

16.     At the time Plaintiffs purchased the Property, the Property served as Plaintiffs' principal residence.

17.     Pursuant to the terms of the Loan, Plaintiffs were obligated to make initial monthly payments in the amount of $2,062.08 (principal and interest) for 30 years.[1]

18.     At all times relevant, Plaintiffs maintained their own property insurance policy and homeowner's association insurance policy for the Property.

19.     At all times relevant, the insurance policies were funded and active.

20.     In early 2020, Shellpoint acquired and/or began servicing the Loan.

21.     At the time Shellpoint began servicing the Loan, the Loan was not escrowed and therefore Plaintiffs were obligated to (1) make the real estate tax payments for the Property directly to the appropriate municipal entity; and (2) maintain their own property insurance for the Property.

22.     At the time Shellpoint acquired and/or began servicing the Loan, Plaintiffs were contractually current on the payments on the Loan.

---

[1] The Loan was a variable interest loan and therefore the interest rate was subject to adjustment at certain periods throughout the Loan period.

23.     At the time Shellpoint began servicing the Loan, Plaintiffs maintained their own property insurance policy and had an active homeowner's association insurance policy on the Property.

24.     On December 28, 2020, Shellpoint sent Plaintiffs a correspondence that stated, in pertinent part:

> Our records show that your homeowner's association (HOA) hazard insurance expired and we do not have evidence that your homeowner's association has obtained new coverage. Because homeowner's association (HOA) hazard insurance is required on your property, we plan to buy insurance for your property. You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.
>
> You should immediately provide us with your insurance information. We urge you to contact your Homeowner's Association to obtain current evidence of homeowner's association (HOA) hazard insurance for your property referenced above. This information must be provided in writing and can be faxed to our Insurance Department at (248) 878-2370. You may also submit your insurance policy at https://www.ExpressInsuranceInfo.com/2919836, or mail it to the following address:

Shellpoint Mortgage Servicing
ISAOA/ATIMA
PO Box 7050
Troy, MI 48007-7050

25.     On January 15, 2021, in response to Shellpoint's request for proof of insurance, Plaintiffs' insurance agent submitted the proof of insurance requested by Shellpoint through the website referenced in Shellpoint's December 28, 2020 correspondence.

26.     After submitting the proof of insurance, Plaintiffs' insurance agent called Shellpoint to confirm that the proof of insurance submitted on behalf of Plaintiffs was received and was sufficient.

27.     During this call, a Shellpoint representative confirmed receipt of the proof of insurance and assured Plaintiffs' insurance agent that no further action by Plaintiffs was necessary.

28.     On or about January 27, 2021, Shellpoint sent another correspondence to Plaintiffs seeking proof of insurance for the Property.

29.     Shortly after receiving the correspondence, Plaintiffs' insurance agent resubmitted the requested proof of insurance to Shellpoint.

30.     In February 2021, Shellpoint sent Plaintiffs a correspondence indicating that Shellpoint will be purchasing a property insurance policy on behalf of Plaintiffs ("forced-placed insurance") because Plaintiffs failed to provide the requested proof of insurance.

31.     On February 24, 2021, in response to the correspondence, Plaintiffs, through their insurance agent, submitted proof of insurance to Shellpoint for the *third* time.

32.     After submitting the proof of insurance, Plaintiff's insurance agent placed a phone call to Shellpoint to confirm that Shellpoint received the proof of insurance.

33.     During this call, Shellpoint's representative advised Plaintiffs' insurance agent that Shellpoint did not receive the policy and requested that Plaintiffs' insurance agent submit the proof of insurance via email.

34.     In response, Plaintiffs' insurance agent followed Shellpoint's representative's instructions and emailed the proof of insurance to Shellpoint.

35.     On March 2, 2021, Shellpoint's representative Tikkitress Clark confirmed receipt of the proof of insurance via an email to Plaintiffs' insurance agent and advised Plaintiffs' insurance agent that Shellpoint will not move forward with purchasing property insurance for the Property.

36.     On March 3, 2021, Plaintiffs' insurance agent contacted Shellpoint to confirm that the insurance issue has been resolved.

37.     During this call, a Shellpoint representative advised Plaintiffs' insurance agent that the policy submitted by Plaintiffs needs to be increased to $380,200. However, there was no factual or legal basis for Shellpoint's request to increase the policy limits.

38.     Despite there being no factual or legal basis for Shellpoint's request for an increase in the insurance coverage, Plaintiffs immediately increased the coverage to $380,200 to resolve the issue and submitted an updated proof of insurance to Shellpoint.

39.     In response to receiving proof of the increased insurance coverage, Shellpoint's representative confirmed that the Loan will not be charged for forced-placed insurance.

40.     On April 3, 2021, Shellpoint sent a mortgage statement to Plaintiffs.

41.     The April mortgage statement indicated that (1) Plaintiffs' mortgage payment was *increasing* from $2,235.08 to $2,542.46; and (2) Shellpoint unilaterally opened an escrow account for the Loan.

42.     Moreover, the April mortgage statement indicated that (1) on March 3, 2021, Shellpoint assessed a **$5,454.58** charge to the Loan for "Lender Placed Hazard" insurance; and (2) Plaintiffs were being charged $307.38 per month for the forced-placed insurance.

43.     Despite Shellpoint's representation that it would not charge the Loan for forced-place insurance, it charged the Loan $5,454.58 for forced-placed insurance.

44.     On April 13, 2021, Rachael and Plaintiffs' insurance agent sent written correspondences via email to Shellpoint disputing the forced-placed insurance charge to the Loan.

45.     On April 13, 2021, in response to the written correspondences, Shellpoint indicated that the previous proofs of insurance were insufficient as Shellpoint now needs proof of insurance dating back to **<u>2019</u>** in order to cancel the forced-placed insurance.

46.     On April 13, 2021, despite being perplexed as to the reason Shellpoint needs proof of insurance dating back to 2019, Plaintiffs, through their insurance agent, submitted proof of insurance dating back to 2019 to Shellpoint via email.

47.     Despite repeatedly providing proof of insurance to Shellpoint, Shellpoint continued to charge the Loan for forced-placed insurance.

48.     On May 3, 2021, Shellpoint sent a mortgage statement to Plaintiffs that erroneously (1) asserted an escrow shortage of $3,688.53; and (2) demanded a payment of $307.38 for escrow (monthly escrow charge).

49.     On June 3, 2021, Shellpoint sent a mortgage statement to Plaintiffs that erroneously (1) asserted an escrow shortage of $3,688.53; and (2) demanded a payment of $307.38 for escrow (monthly escrow charge).

50.     On or about June 25, 2021, Shellpoint sent a correspondence to Plaintiffs that erroneously stated that Plaintiffs' insurance coverage had lapsed.

51.     In response, Plaintiffs promptly submitted proof to Shellpoint that their property insurance had not lapsed.

52.     On July 3, 2021, Shellpoint sent a mortgage statement to Plaintiffs that erroneously (1) asserted an escrow deficiency of $3,688.53; and (2) demanded a payment of $307.38 for escrow (monthly escrow charge).

53.     On or about July 26, 2021, Shellpoint sent Plaintiffs a correspondence that erroneously stated that Shellpoint intends on purchasing property insurance for the Property because Plaintiffs have failed to provide Shellpoint with proof of insurance.

54.     In response, Plaintiffs again contacted Shellpoint to dispute the forced-placed insurance charge that was assessed to the Loan.

55.     On or about August 6, 2021, Shellpoint sent a correspondence to Plaintiffs stating that the forced-placed insurance that Shellpoint purchased for the Property would be cancelled effective August 6, 2021.

56.     On or about August 11, 2021, Shellpoint sent a correspondence to Plaintiffs that falsely stated that Shellpoint has not received proof of insurance from Plaintiffs and that "it has become necessary to place lender-placed insurance coverage on [the Property]."

57.     On August 18, 2021, Shellpoint sent a mortgage statement to Plaintiffs that erroneously (1) asserted an escrow deficiency of $3,688.53; and (2) demanded a payment of $307.38 for escrow (monthly escrow charge).

58.     The mortgage statement further indicated that (1) the Loan was **$307.38 past due**; (2) Shellpoint is holding Plaintiffs' July payment in the amount of $2,235.08 in a suspense account (presumably because it was insufficient to cover the erroneous escrow charges); and (3) Shellpoint assessed late charges in the amount of $111.75 to the Loan.

59.     Shellpoint's assertion that the Loan was past due was patently false because Plaintiffs made every principal and interest payment that had become due pursuant to the terms of the Loan.

60.     Shortly after Plaintiffs received the mortgage statement alleging that the Loan was in default, Shellpoint began sending Plaintiffs correspondences alleging that the Loan was in default and offering Plaintiffs options to avoid foreclosure.

61.     On August 27, 2021, Rachael called Shellpoint and spoke to Shellpoint's representative Tikkitress Clark.

62.     During this call, Rachael disputed (1) Shellpoint's assertion that Plaintiffs have not submitted proof of insurance; and (2) the forced-placed insurance charges that led Shellpoint to deem the Loan in default.

63.     In response, Shellpoint's representative Tikkitress Clark (1) advised Rachael that Shellpoint made an entry error that caused the cancellation of the forced-placed insurance to not go through; and (2) assured Rachael that Shellpoint will fix its errors.

64.     On September 1, 2021, Rachael called Shellpoint to confirm that Shellpoint fixed its errors. After being on hold for over an hour, Rachael spoke to Tikkitress Clark.

65.     During this call, Tikkitress Clark advised Rachael that Shellpoint is still working on fixing its errors with respect to the forced-placed insurance and that she will provide Rachael with an update in short order.

66.     On September 15, 2021, Rachael called Shellpoint and spoke with Shellpoint's representative Tiffany Taylor, who held herself out as a supervisor.

67.     During this call, Tiffany Taylor advised Rachael that Shellpoint requested cancellation of the forced-placed insurance in December 2019 and assured Rachael that the cancellation request will go through and that Plaintiffs will be receiving a refund of $3,690.03.

68.     Despite Shellpoint's repeated assurances that it will remove and/or reverse the forced-placed insurance charges, Shellpoint failed to remove and/or reverse the forced-placed insurance charges.

69.     As a result, Shellpoint began reporting the Loan as delinquent on Plaintiffs' credit reports.

70.     On September 18, 2021, Shellpoint sent a mortgage statement to Plaintiffs that erroneously (1) asserted an escrow shortage of $3,391.97; and (2) demanded a payment of $307.38 for escrow (monthly escrow charges).

71.     The mortgage statement further indicated that (1) the Loan was **$683.36 past due**; (2) Shellpoint was holding funds in a suspense account and not immediately applying the payments; and (3) Shellpoint assessed $109.60 in erroneous late fees to the Loan.

72.     In September and October 2021, Rachael sent multiple written correspondences to Shellpoint disputing the forced-placed insurance charges and requesting that Shellpoint fix its errors as Plaintiffs (1) have repeatedly provided Shellpoint with proof of insurance; and (2) are contractually current on their payments on the Loan.

73.     Despite Plaintiffs' repeated disputes of the forced-placed insurance charges and resulting late fees, Shellpoint (1) refused to reverse the forced-placed insurance charges and late fees; (2) continued its attempts to collect money for escrow; (3) continued to deem the Loan in default; (4) continued to report the Loan as in default to the CRAs; and (5) continued to assess erroneous late fees to the Loan.

74.     Moreover, Shellpoint began placing harassing collection calls to Plaintiffs despite the fact that the Loan was contractually current.

75.     In response to the collection calls, Plaintiffs repeatedly disputed Shellpoint's contention that the Loan was in default and demanded that the collections cease.

76.     Despite Plaintiffs' requests that the harassing collection calls cease, Shellpoint continued pounding Plaintiffs with collection calls, with the vast majority of calls being made to Richard's cellular phone.

77.     In total, Shellpoint placed over 100 harassing collection calls to Plaintiffs in an attempt to collect a fictitious default.

78.     In October 2021, fed up with Shellpoint's incompetence and harassing conduct, Plaintiffs refinanced the Loan in order to get Shellpoint out of their lives.

### Credit Reporting Disputes

79.     In November 2021, Plaintiffs checked their credit reports to see if Shellpoint has corrected its inaccurate credit reporting.

80.     To Plaintiffs dismay, Shellpoint was falsely reporting Plaintiffs' August and September 2021 payments as over 30 day past due to the CRAs.

81.     Shellpoint's credit reporting was inaccurate because Plaintiffs (1) never missed a mortgage payment; and (2) timely made all of their mortgage payments.

82.     In November 2021, Plaintiffs submitted disputes (via telephone) to Experian, Equifax, and Trans Union challenging Shellpoint's inaccurate credit reporting.

83.     Upon information and belief, the CRAs sent Plaintiffs' disputes to Shellpoint. *See* 15 U.S.C. §1681i(a)(2).

**a.     CRAs' Responses to Richard's Disputes**

84.     On December 1, 2021, Equifax responded to Richard's dispute. Equifax's response revealed that Shellpoint and Equifax did not correct the disputed information. Accordingly, the August and September 2021 payments continued to report as over 30 days past due on Richard's Equifax credit report.

85.     On December 2, 2021, Experian responded to Richard's dispute. Experian's response revealed that Shellpoint and Experian did not correct the disputed information.

Accordingly, the August and September 2021 payments continued to report as over 30 days past due on Richard's Experian credit report.

86.     On December 2, 2021, Trans Union responded to Richard's dispute. Trans Union's response revealed that Shellpoint and Trans Union did not correct the disputed information. Accordingly, the August and September 2021 payments continued to report as over 30 days past due on Richard's Trans Union credit report.

**b.     CRAs' Responses to Rachael's Disputes**

87.     On December 1, 2021, Equifax responded to Rachael's dispute. Equifax's response revealed that Shellpoint and Equifax did not correct the disputed information. Accordingly, the August and September 2021 payments continued to report as over 30 days past due on Rachael's Equifax credit report.

88.     On December 2, 2021, Experian responded to Rachael's dispute. Experian's response revealed that Shellpoint and Experian did not correct the disputed information. Accordingly, the August and September 2021 payments continued to report as over 30 days past due on Richard's Experian credit report.

89.     On December 2, 2021, Trans Union responded to Rachael's dispute. Trans Union's response revealed that Shellpoint and Trans Union did not correct the disputed information. Accordingly, the August and September 2021 payments continued to report as over 30 days past due on Rachael's Trans Union credit report.

90.     To date, Shellpoint and the CRA Defendants continue to falsely report the August and September 2021 payments as over 30 days past due on Plaintiffs' credit reports.

## Shellpoint's Forced-Placed Insurance Scheme

91.     Upon information and belief, Shellpoint receives kickbacks from the insurer that issued the insurance policy that Shellpoint unilaterally purchased on behalf of Plaintiffs without a valid factual or legal basis.

92.      Accordingly, Shellpoint profited from the purchase of the insurance policy to the detriment of Plaintiffs.

93.     Upon information and belief, Shellpoint's conduct in unilaterally purchasing a property insurance policy despite having actual knowledge that a borrower maintains his/her own policy is a widespread practice that has injured hundreds, if not thousands, of consumers in Texas.

94.     In fact, there is a pending class action in Illinois against Shellpoint that alleges the precise misconduct that is alleged by Plaintiffs herein. *See Cardin v. NewRez LLC d/b/a Shellpoint Mortgage Servicing,* 1:21-cv-03350 (N.D. Ill. 2021).

95.     Astonishingly, Shellpoint settled a class action on a class-wide basis in 2019 that alleged that precise misconduct that is alleged by Plaintiffs herein. *See Chong v. New Penn Financial LLC d/b/a Shellpoint Mortgage Servicing,* 9:18-cv-80948 (S.D. Fla. 2018).

96.     Despite settling an identical class action on a class-wide basis, Shellpoint has brazenly continued its forced-placed insurance scheme.

97.     Upon information and belief, Shellpoint's forced-placed insurance scheme has resulted in massive profits to Shellpoint at the expense of vulnerable consumers.

## DAMAGES

98.     Plaintiffs repeatedly notified Shellpoint of its errors in relation to the forced-placed insurance and provided Shellpoint many opportunities to fix its errors.

99.   Instead of fixing its errors, Shellpoint repeatedly gave Plaintiffs the run-around and false assurances that the forced-placed insurance will be canceled and that the charges will be reversed.

100.   As a result of Shellpoint's unfair and deceptive conduct, Plaintiffs were significantly harmed.

101.   Specifically, Plaintiff were forced to pay the erroneous late charges to Shellpoint when they refinanced the Loan to escape Shellpoint's unfair conduct.

102.   In addition to financial losses, Plaintiffs suffered severe emotional distress and mental anguish as a result of (1) Shellpoint erroneously deeming the Loan in default when it was current; (2) Shellpoint's chronic failure to fix its errors despite its representations that it would; (3) Shellpoint's inaccurate and damaging credit reporting; (4) Shellpoint's harassing collection calls; and (5) Shellpoint's refusal to correct its false credit reporting.

103.   The excruciating stress caused by Shellpoint adversely impacted Plaintiffs' quality of life and every-day general well-being.

104.   Specifically, Plaintiffs were chronically stressed and agitated for nearly 10 months, and lived in constant fear of the Property being pushed into foreclosure as a result of Shellpoint's errors.

105.   The chronic stress and fear impacted (1) Plaintiffs' daily interactions with each other and their children; and (2) Plaintiffs' ability to focus at work.

106.   Moreover, Plaintiffs lost significant time addressing Shellpoint's erroneous charges and repeated requests for proof of insurance. In total, Plaintiffs wasted over 100 hours dealing with the erroneous charges assessed by Shellpoint.

107.    As set forth above, Plaintiffs repeatedly disputed the erroneous charges with Shellpoint, only to be falsely assured that Shellpoint will fix its errors and refund the erroneous forced-placed insurance charges.

108.    Moreover, the inaccurate credit reporting of the Loan devastated and continues to devastate Plaintiffs' creditworthiness because it creates a false impression that Plaintiffs defaulted on the Loan, therefore rendering Plaintiffs as high-risk consumers and damaging their ability to obtain credit with favorable terms.

109.    As a result of Shellpoint's inaccurate credit reporting of the Loan, Plaintiffs were forced to obtain a refinance loan at a higher interest rate than they would have otherwise qualified for had Shellpoint not inaccurately reported derogatory information on Plaintiffs' credit reports.

110.    Notably, the refinance loan that Plaintiffs obtained was at a *higher* interest rate than the interest rate on the Loan.

111.    Moreover, as a result of the credit damage caused by Shellpoint's inaccurate credit reporting of the Loan, Plaintiffs were in a constant state of fear that their credit card companies would increase their interest rates and/or decrease their credit limits.

112.    Plaintiffs were forced to file the instant case to compel Shellpoint to correct its inaccurate credit reporting.

## **CLASS ALLEGATIONS**

113.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

114.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) individually, and on behalf of all others similarly situated ("Putative Class"). The Putative Class is defined as follows:

All individuals residing within the Western District of Texas (this judicial district) (1) who have/had a mortgage loan serviced by Shellpoint; (2) in which Shellpoint purchased a property insurance policy; (3) and charged the costs of the property insurance policy to the individual's mortgage loan; (4) after the individual submitted proof of insurance to Shellpoint; (5) within the two years preceding the date of the original complaint through the date of class certification.

115.    The following individuals are excluded from the Putative Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Shellpoint, Shellpoint's subsidiaries, parents, successors, predecessors, and any entity in which Shellpoint or its parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiffs' attorneys; (4) individuals who properly execute and file a timely request for exclusion from the Putative Class; (5) the legal representatives, successors or assigns of any such excluded individuals; and (6) individuals whose claims against Shellpoint have been fully and finally adjudicated and/or released.

**A.    Numerosity**

116.    Upon information and belief, the members of the Putative Class are so numerous that joinder of them is impracticable.

117.    The exact number of the members of the Putative Class is unknown to Plaintiffs at this time and will be determined through discovery.

118.    The members of the Putative Class are ascertainable because the Class is defined by reference to objective criteria.

119.    The members of the Putative Class are identifiable in that their names, addresses, and telephone numbers can be identified in business records maintained by Shellpoint.

**B.    Commonality and Predominance**

120.    There are many questions of law and fact common to the claims of Plaintiffs and the Putative Class, including whether Shellpoint's conduct in unilaterally purchasing insurance policies and assessing charges to mortgage loans for the insurance policies despite having actual knowledge that the borrowers maintain their own policies violates the TDCA.

121.    Those questions predominate over any questions that may affect individual members of the Putative Class.

**C.    Typicality**

122.    Plaintiffs' claims are typical of members of the Putative Class because Plaintiffs and members of the Putative Class are entitled to damages as a result of Shellpoint's conduct.

**D.    Superiority and Manageability**

123.    This case is also appropriate for class certification as class proceedings are superior to all other available methods for the efficient and fair adjudication of this controversy.

124.    The damages suffered by the individual members of the Putative Class will likely be relatively small, especially given the burden and expense required for individual prosecution.

125.    By contrast, a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

126.    Economies of effort, expense, and time will be fostered and uniformity of decisions ensured.

**E.    Adequate Representation**

127.    Plaintiffs will adequately and fairly represent and protect the interests of the Putative Class.

128.    Plaintiffs have no interests antagonistic to those of the Putative Class and Shellpoint has no defenses unique to Plaintiffs.

129.    Plaintiffs have retained competent and experienced counsel in consumer class action litigation.

**COUNT I –**
**VIOLATIONS OF THE TEXAS DEBT COLLECTION ACT**
**(On behalf of Plaintiffs and the Members of the Putative Class against Shellpoint)**

130.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

131.    Plaintiffs are each a "consumer" under the TDCA because they are individuals who have/had a consumer debt, the Loan.

132.    The Loan is a "consumer debt" as defined by the TDCA because it was incurred for personal and family purposes. Specifically, the Loan was taken out to fund the purchase of Plaintiffs' family home.

133.    Shellpoint is a "debt collector" as defined by the TDCA because it directly engaged in debt collection by attempting to collect the Loan from Plaintiffs.

a.      **Violations of §392.303(a)(2) of the TDCA**

134.    Section 392.303(a) of the TDCA prohibits a debt collector from using unfair or unconscionable means in an attempt to collect a debt, including collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer. Tex. Fin. Code §392.303(a) and (a)(2).

135.    Shellpoint violated §392.303(a)(2) of the TDCA by (1) attempting to collect forced-placed insurance charges; and (2) collecting late charges that were not legally chargeable to Plaintiffs.

136.    As set forth extensively above, Shellpoint unfairly charged Plaintiffs for forced-place insurance despite the fact that Plaintiffs maintained their own property insurance for the Property. Despite repeated disputes by Plaintiffs, Shellpoint refused to reverse the charges or remove the forced-place insurance and resulting late charges.

137.    Shellpoint had no factual, contractual, or legal basis to charge the Loan for forced-placed insurance as Plaintiffs maintained their own insurance policy and repeatedly provided proof of the same to Shellpoint.

138.    Accordingly, it was unfair and unconscionable for Shellpoint to collect and attempt to collect amounts it was not entitled to, including (1) fictitious past due amounts, (2) improper charges for forced-placed insurance, (3) fictitious amounts needed to fund the escrow account, and (4) improper late charges that were triggered by the forced-placed insurance charges.

### b.    Violations of §392.304(a)(8) of the TDCA

139.    Section 392.304(a) of the TDCA prohibits a debt collector from using fraudulent, deceptive, or misleading representations in an attempt collect a debt, including misrepresenting the character, extent, or amount of a consumer debt. Tex. Fin. Code §392.304(a) and (a)(8).

140.    Shellpoint violated §392.304(a)(8) of the TDCA by repeatedly misrepresenting the amount owed on the Loan.

141.    Specifically, as set forth extensively above, Shellpoint repeatedly sent Plaintiffs mortgage statements and dunning letters that attempted to collect bogus charges for forced-placed insurance, escrow, and late charges.

142.    The amounts sought by Shellpoint were inflated as Plaintiffs maintained their own property insurance for the Property and therefore did not owe *any* amount for forced-placed insurance, escrow, or late fees.

143.    Shellpoint had no factual, contractual, or legal basis to charge the Loan for forced-placed insurance, escrow, and late fees as Plaintiffs maintained their own insurance policy and repeatedly provided proof of the same to Shellpoint.

144.    Accordingly, it was deceptive and misleading for Shellpoint to collect and attempt to collect amounts it was not entitled to, including (1) fictitious past due amounts, (2) improper charges for forced-placed insurance, (3) fictitious amounts needed to fund the escrow account, and (4) improper late charges that were triggered by the forced-placed insurance charges.

      **c.**      **Violations of §392.304(a)(12) of the TDCA**

145.    Section 392(a)(12) prohibits a debt collector from representing that a consumer debt may be increased by the addition of attorney's fees, investigation fees, service fees, or *other charges* if a written contract or statute does not authorize the additional fees or charges. Tex. Fin. Code §392.304 (a)(12) (emphasis added).

146.    Shellpoint violated §392(a)(12) by representing to Plaintiffs that the Loan balance may increase if Shellpoint purchases lender-placed insurance on the Property at a time when Shellpoint had actual knowledge that Plaintiffs maintained their own property insurance on the Property.

147.    Shellpoint could not contractually or statutorily charge the Loan for forced-placed insurance at a time when Plaintiffs maintained their own property insurance policy and Shellpoint had actual knowledge of the same. As set forth above, Plaintiffs maintained their own property insurance policy and repeatedly provided proof of the same to Shellpoint.

      **d.**      **Violations of §392.304(a)(19) of the TDCA**

148.    Section 392.304(a)(19) of the TDCA prohibits a debt collector from using any false representation or deceptive means to collect a debt or obtain information concerning a consumer. Tex. Fin. Code §392.304(a)(19).

149.    Shellpoint violated §392.304(a)(19) by deceptively charging Plaintiffs for forced-placed insurance, escrow, and late charges when it had no factual, contractual, or legal basis to do so.

150.    As set forth extensively above, Shellpoint deceptively charged Plaintiffs for forced-place insurance despite the fact that Plaintiffs maintained their own property insurance for the Property and Shellpoint had actual knowledge of the same. Despite repeated disputes by Plaintiffs, Shellpoint refused to reverse the charges or remove the forced-place insurance and resulting late charges.

151.    Moreover, it was deceptive for Shellpoint to repeatedly represent to Plaintiffs that it would remove the forced-placed insurance and provide a refund to Plaintiffs when it had no intention to do so.

**e.    Violations of §392.302(4) of the TDCA**

152.    Section 392.302(4) of the TDCA prohibits a debt collector from oppressing, harassing, abusing a person by causing a telephone to ring repeatedly or continuously, or making repeated or continuous telephone calls, with the intent to harass a person at the called number. Tex. Fin. Code §392.302(4).

153.    Shellpoint violated §392.302(4) by placing harassing collection calls to Plaintiffs after Plaintiffs requested that Shellpoint cease its harassing collecting calls.

154.    As set forth above, all of Shellpoint's collection calls were placed in an effort to collect fictitious past due amounts

155.    The fact that Shellpoint continued to place harassing collection calls to Plaintiffs after Plaintiffs requested that the collection calls cease demonstrates Shellpoint's intent to harass Plaintiffs.

156.    Plaintiffs had no choice but to submit to Shellpoint's unfair and deceptive conduct as Plaintiffs had no choice in who services the Loan and the only viable option to escape Shellpoint's unfair and deceptive conduct was to refinance the Loan, which Plaintiffs ultimately did.

157.    Consumers should not be forced to refinance their mortgage loans to escape abhorrent conduct such as Shellpoint's conduct towards Plaintiffs.

158.    As pled above, Plaintiffs were significantly harmed by Shellpoint's conduct.

159.    Shellpoint's widespread scheme to defraud borrowers is driven by greed and is objectively against public policy.

160.    Shellpoint's overall conduct as described herein is objectively unfair and against public policy because it results in monetary loss to consumers as their loans are unfairly driven into default and they are forced to pay for more expensive insurance policies that are unilaterally purchased by Shellpoint without a valid basis.

161.    Shellpoint's conduct is against public policy because:

a.  it results in monetary loss to consumers;

b.  it is driven by greed and results in profits to Shellpoint at the consumers' expense;

c.  consumers reasonably expect their mortgage company to not unilaterally purchase and profit from unwarranted forced-placed insurance at the consumers' expense;

d.  consumers reasonably expect their mortgage company to not collect amounts it was not entitled to;

e.  consumers reasonably expect their mortgage company to not overstate the amounts owed on their loans;

23

    f.   consumers reasonably expect their mortgage company to communicate with them truthfully regarding the status of their loans;

    g.   consumers reasonably expect their mortgage company to investigate their disputes/grievances in good faith;

    h.   consumers reasonably expect their mortgage company to issue refunds after making assurances that a refund is forthcoming;

    i.   consumers reasonably expect their mortgage company to accurately credit report the status of their mortgage loan;

    j.   consumers reasonably expect their mortgage company to comply with laws designed to protect consumers; and

    k.   consumers reasonably expect their mortgage company to follow state and federal law and their own guidelines.

162.    Shellpoint's conduct as described above is part of a pattern and practice in which Shellpoint routinely engages in as part of its business model.

163.    Specifically, Shellpoint has been repeatedly sued by State Attorney Generals across the United States for engaging in unfair conduct similar to the conduct complained of herein.

164.    Shellpoint mistreats consumers on a wide scale and its unlawful conduct has been publicized and condemned.

165.    Despite lawsuits filed by consumers and State Attorney Generals, Shellpoint brazenly continues to mistreat consumers nationwide.

**WHEREFORE**, Plaintiffs on behalf of themselves and the members of the Putative Class, request the following relief:

    a)   An order granting certification of the proposed class, including the designation of Plaintiffs as the named representatives, and the appointment of the undersigned as Class Counsel;

    b)   A finding that Shellpoint violated the TDCA;

c) An order enjoining Shellpoint from unilaterally purchasing property insurance policies on behalf of borrowers without a valid basis to do so;

d) An award of compensatory damages to Plaintiffs and members of the Putative Class;

e) An award of statutory damages to Plaintiffs and members of the Putative Class;

f) An award of Plaintiffs' reasonable attorney's fees and costs; and

g) Any other relief this Court deems just and proper.

## COUNT II –
## BREACH OF CONTRACT
### (Plaintiffs Individually Against Shellpoint)

166.     All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

167.     The Loan/Mortgage was a valid and enforceable contract between Plaintiffs and First Horizon and its successors and assigns ("the contract").

168.     Shellpoint is a successor and/or assignee of the Loan and Mortgage and is therefore bound by the terms of the contract.

169.     Plaintiffs performed their duties under the contract by tendering all monthly payments to Shellpoint and its predecessors and by complying with all of the other terms of the contract.

170.     Shellpoint materially breached the contract by:

a. unilaterally purchasing a property insurance policy and charging Plaintiffs the costs of the policy at a time when it had actual knowledge that Plaintiffs had an active property insurance policy covering the Property;

b. charging the costs of the forced-placed insurance to the Loan;

c.  deeming the Loan in default when it was current;

d.  erroneously alleging an escrow shortage without proper notice to Plaintiffs;

e.  misapplying Plaintiffs' payments by holding the payments in suspense and not timely applying the payments per the terms of the Loan and Mortgage;

f.  charging bogus late fees to the Loan  when Plaintiffs were contractually current on the Loan;

g.  failing to investigate Plaintiffs' disputes;

h.  failing to adequately respond to Plaintiffs' disputes;

i.  failing to reverse the bogus charges for forced-placed insurance and resulting late fees; and

j.  failing to deal with Plaintiffs in good faith.

171.    As stated above, Shellpoint's breach of contract has caused Plaintiffs significant economic and non-economic damages.

**WHEREFORE,** Plaintiffs respectfully request the following relief:

a)  A finding that Shellpoint materially breached the contract;

b)  Compensatory damages for Shellpoint's breach of contract; and

c)  Any other relief the Court deems just and proper.

### COUNT III–
### UNJUST ENRICHMENT
### (Plaintiffs Individually Against Shellpoint)

172.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

173.    Plaintiffs bring their unjust enrichment claim as an alternative claim in the event there is no enforceable contract between Plaintiffs and Shellpoint.

174.    "Under Texas law, unjust enrichment characterizes the result of failing to make restitution for benefits received under circumstances giving rise to an implied or quasi-contract." *Villalobos v. PNC Bank N.A.,* 2014 U.S. Dist. LEXIS 153452, at *4 (S.D. Tex. 2014).

175.    In Texas, "[t]o recover under an unjustment enrichment theory, the benefits to the other party must be actually unjust under the principles of equity." *Cavada v. Bank of Am., N.A.,* 2015 U.S. Dist. LEXIS 70875, at *18 (W.D. Tex. 2015).

176.    Shellpoint unjustly retained a benefit to Plaintiffs' detriment by deceptively collecting late fees and other charges that it was not entitled to.

177.    As set forth above, Shellpoint failed to make restitution for the benefits it received through its unfair deceptive conduct relating to the forced-placed insurance.

178.    Shellpoint's conduct is objectively unjust under the principles of equity.

179.    Shellpoint's retention of such amounts objectively violates the fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiffs request the following relief:

    a.   A finding that Shellpoint has been unjustly enriched by Plaintiffs;

    b.   An award of compensatory damages; and

    c.   Any other relief this Court deems just and proper.

**COUNT IV –**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**(Plaintiffs Individually Against Shellpoint)**

180.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

181.    Plaintiffs are each a "consumer" as defined by 15 U.S.C. §§1681a(b) and (c).

182.    Plaintiffs are each a "person" as defined by 15 U.S.C. §1681a(b).

183.    Shellpoint is a "furnisher of information" as defined by 15 U.S.C. §1681s-2 and a "financial institution" as defined by 15 U.S.C. §1681a(t).

184.    At all times relevant, the above mentioned credit reports were "consumer reports" as the term is defined by §1681a(d)(1).

185.    Shellpoint violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct a reasonable investigation into each of Plaintiffs' disputes submitted by Plaintiffs to Experian, Equifax, and Trans Union.

186.    Shellpoint violated 15 U.S.C. §1681s-2(b)(1)(B) by repeatedly failing to review all relevant information included in Plaintiffs' disputes that were submitted to Experian, Equifax, and Trans Union.

187.    Had Shellpoint taken any meaningful steps to investigate Plaintiffs' valid disputes, it would have determined that the Loan was erroneously reporting as over 30 days past due for August and September 2021.

188.    As set forth above, Shellpoint's credit reporting was inaccurate as Plaintiffs timely made their August and September 2021 mortgage payments pursuant to the terms of the Loan.

189.    Shellpoint violated 15 U.S.C. §§1681s-2(b)(1)(C) and (D) by failing to report the results of its investigations to the CRAs after being put on notice and discovering that it was reporting inaccurate and misleading information pertaining to the Loan.

190.    Shellpoint violated 15 U.S.C. §1681s-2(b)(1)(E) by failing to modify, delete, or permanently block its inaccurate credit reporting of the Loan after receipt of Plaintiffs' disputes.

191.    Shellpoint violated 15 U.S.C. §1681s-2(a)(3) by failing to report that Plaintiffs disputed the accuracy of Shellpoint's reporting of the Loan to the CRAs.

192.    Despite being on notice of its erroneous credit reporting of the Loan, and Plaintiffs' efforts to correct the errors, Shellpoint repeatedly refused to correct its erroneous credit reporting. Instead, Shellpoint repeatedly furnished and re-reported inaccurate and misleading information regarding the Loan to the CRAs.

193.    Any reasonable investigation by Shellpoint would have confirmed the veracity of Plaintiffs' disputes, yet Shellpoint's false credit reporting of the Loan persists in Plaintiffs' Experian, Equifax, and Trans Union credit reports.

194.    Had Shellpoint taken any meaningful steps to investigate Plaintiffs' valid disputes, it would have permanently corrected its false credit reporting. Plaintiffs provided supporting information in their disputes, yet Shellpoint repeatedly ignored the supporting evidence and continued its false reporting of the Loan.

195.    By deviating from the standards established by the credit industry and the FCRA, Shellpoint acted with reckless and willful disregard for its duty as a furnisher to report accurate and complete consumer credit information to the CRAs.

196.    Shellpoint has exhibited a pattern of refusing to correct credit reporting errors despite being on notice that the its false credit reporting is wreaking havoc on consumers' credit scores, ultimately valuing its own bottom line above its grave responsibility to report accurate data to the CRAs.

197.    As set forth above, Plaintiffs were significantly harmed by Shellpoint's repeated inaccurate credit reporting of the Loan.

**WHEREFORE**, Plaintiffs request the following relief:

A.    A finding that Shellpoint's conduct as set forth herein violates the FCRA;

B.     An order enjoining Shellpoint from reporting the disputed information to the Credit Reporting Agencies;

C.     An award of compensatory damages to Plaintiffs to be determined by the jury;

D.     An award of statutory damages of $1,000.00 to each Plaintiff for each violation of the FCRA;

E.     An award of punitive damages to be determined by the jury; and

F.     An award of reasonable attorney's fees and costs pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o.

**COUNT V**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**(Plaintiffs Individually Against Experian, Equifax, and Trans Union)**

198.   All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

199.    The CRA Defendants are each a ""consumer reporting agency" as defined by 15 U.S.C. §1681a(f).

200.   The CRA Defendants are each a "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" as defined by 15 U.S.C. §1681a(p).

201.   At all times relevant, the above mentioned credit reports were "consumer reports" as that term is defined by §1681a(d).

202.   The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b)

203.    The FCRA requires the CRA Defendants to implement procedures and systems to promote accurate credit reporting.

204.     If a consumer notifies a credit reporting agency of a dispute concerning the accuracy of any item of credit information, the FCRA requires the credit reporting agency to conduct a reasonable investigation to determine whether the disputed information is inaccurate and record the current status of the disputed information or delete the disputed information within 30 days of receiving the dispute. 15 U.S.C. §1681i(a)(1)(A).

205.    The CRA Defendants failed to conduct meaningful investigations into Plaintiffs' disputes. Instead, they continued to blindly report the false information provided to them by Shellpoint.

206.     The CRA Defendants violated 15 U.S.C. §1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in preparation of the consumer reports it furnished and refurnished concerning Plaintiffs. Upon information and belief, the CRA Defendants distributed patently false and materially misleading consumer reports concerning Plaintiffs to third parties.

207.    The CRA Defendants failed to follow reasonable procedures to assure maximum possible accuracy by ignoring the merits of Plaintiffs' disputes and blindly accepting Shellpoint's erroneous reporting as accurate.

208.    Had the CRA Defendants followed reasonable procedures to assure maximum possibly accuracy, they would have conducted a meaningful investigation into Plaintiffs' disputes and promptly discovered that the information that Shellpoint was reporting was erroneous. Instead, the CRA Defendants repeatedly accepted Shellpoint's erroneous and damaging information as true and continued their reporting of the erroneous information.

209.    The CRA Defendants should have implemented procedures and safeguards to avoid the blind reliance on the information that is being reported by furnishers such as Shellpoint.

210.    The CRA Defendants violated 15 U.S.C. §1681i(a)(1) by failing to (1) conduct a reasonable investigation into Plaintiffs' disputes and (2) delete the inaccurate information from Plaintiffs' credit files.

211.    Had the CRA Defendants conducted a reasonable investigation into Plaintiffs' valid disputes, they would have promptly determined that the Loan was reporting inaccurately.

212.    The CRA Defendants took no meaningful steps to determine whether the information Shellpoint was reporting was accurate and reliable. Instead, the CRA Defendants blindly reported any information that Shellpoint was reporting with no regard to its accuracy.

213.    At very minimum, the CRA Defendants should have requested that Shellpoint provide proof that its credit reporting of the Loan was accurate. Instead, the CRA Defendants continued to recklessly report false and unreliable information regarding the Loan.

214.    The CRA Defendants violated 15 U.S.C. §1681i(a)(2) by failing to provide adequate notification of Plaintiffs' disputes to Shellpoint. Upon information and belief, the CRA Defendants may have failed to include all relevant information provided by Plaintiffs to the CRA Defendants as part of their disputes.

215.    The CRA Defendants violated 15 U.S.C. §1681i(a)(4) by failing to review and consider all relevant information that it received from Plaintiffs with regard to the Loan.

216.    The CRA Defendants violated 15 U.S.C. §1681i(a)(5) by failing to delete or modify the inaccurate information that was the subject of Plaintiffs' disputes.

217.    The CRA Defendants violated 15 U.S.C. §1681c(f) by failing to notate that Plaintiffs disputed the reporting of the Loan. The CRA Defendants are required to notate each

account that a consumer disputes as "disputed" in each consumer report that includes the disputed information.

218.    After receiving Plaintiffs' disputes, the CRA Defendants knew or should have known that Shellpoint's credit reporting of the Loan was inaccurate and should have taken action to correct the disputed information as required by the FCRA.

219.    The CRA Defendants readily distributed Plaintiffs' inaccurate and misleading credit reports to one or more third parties, thereby misrepresenting facts about Plaintiffs and Plaintiffs' creditworthiness.

220.    By deviating from the standards established by the credit reporting industry and the FCRA, the CRA Defendants acted with a reckless disregard for their duties to report accurate and complete consumer credit information.

221.    It is the CRA Defendants' regular business practice to blindly report disputed information without taking the required investigatory steps to meaningfully verify such information as accurate.

222.    The CRA Defendants' non-compliance with the requirements of the FCRA is indicative of the reckless, willful, and wanton nature of their mistreatment of Plaintiffs.

223.    The CRA Defendants have exhibited a pattern of refusing to correct errors in consumer credit files despite being on notice of patently false and materially misleading information contained in such files, ultimately valuing their own bottom line above their grave responsibility to report accurate consumer data.

224.    As stated above, Plaintiffs were significantly harmed by the CRA Defendants' conduct.

**WHEREFORE**, Plaintiffs request the following relief:

A.      A finding that the CRA Defendants' conduct as set forth herein violated the FCRA;

B.      An Order enjoining the CRA Defendants from reporting the disputed information on Plaintiffs' credit reports;

C.      An award of compensatory damages to Plaintiffs to be determined by the jury;

D.      An award of statutory damages of $1,000.00 to each Plaintiff for each violation of the FCRA;

E.      An award of punitive damages to be determined by the jury; and

F.      An award of reasonable attorney's fees and costs pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o; and

G.      Awarding any other relief as this Honorable Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: March 30, 2022                                   Respectfully Submitted,

/s/ *Mohammed O. Badwan*

Mohammed O. Badwan, Esq.
Sulaiman Law Group, Ltd.
2500 S. Highland Ave., Ste. 200
Lombard, IL 60148
Phone (630) 575-8180
mbadwan@sulaimanlaw.com
*Counsel for Plaintiffs*